## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**TRACEY M. CHANCE,**

      **Plaintiff,**

**v.**                           **CASE NO.: 4:18-cv-00586-MW-CAS**

**WAKULLA COUNTY, FLORIDA,**

      **Defendant.**
_____/

## AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiff respectfully amends and supplements her suit against Defendant and states:

## JURISDICTION and VENUE

1.    This action for monetary damages, for declaratory and injunctive relief, and for other equitable and ancillary relief is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. § 1981a (hereinafter Title VII); under the Florida Civil Rights Act of 1992, §§ 760.01-11, Florida Statutes; under the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101; and under the Florida Public Whistleblower Act, § 112.3187, Florida Statutes.

2.    This Court has jurisdiction of the federal claims under 28 U.S.C. §§

1331 and 1343(3) and (4); jurisdiction over the state claims arises under 28 U.S.C. § 1367.

3.      Plaintiff, Tracey M. Chance (hereinafter "Chance" or "Plaintiff"), is a female citizen of the United States and a resident of Wakulla County, Florida, and has so resided at the times material hereto.

4.      Defendant Wakulla County (hereinafter "the County") is a County of the State of Florida, located in the Tallahassee Division of the U.S. District Court for the Northern District of Florida.

## CONDITIONS PRECEDENT

5.      Plaintiff has satisfied all conditions precedent.  Plaintiff filed a charge of discrimination jointly with the Equal Employment Opportunity Commission (EEOC) and the Florida Commission on Human Relations (FCHR). The EEOC provided the Plaintiff with a right to sue letter.

## STATEMENT OF FACTS

6.      Plaintiff is a female citizen of the United States and the State of Florida.

7.      Plaintiff began employment with the County on or about May 27, 2004, as a temporary Building Tech in the Inspections Division of the Building Department.

8.      She was hired as a full-time Building Tech effective October 5, 2004.

2

9.     Plaintiff sought to rise through the ranks. In furtherance of that ambition, she sought to become a Fire Inspector.

10.     Plaintiff completed National Fire Academy courses and coursework at the Florida State Fire College.

11.     During 2007 and 2008, Plaintiff completed coursework related to the Florida Fire Prevention Code, private fire protection systems, construction documents and plans review, building construction for the fire service, fire preventive practices, codes and standards, and became a licensed Fire Inspector I in 2008.

12.     Plaintiff was soon promoted to an Assistant Fire Inspector position, effective October 1, 2008, in the Building Inspection Division of the Building Department.

13.     In this role, Plaintiff was tasked with providing fire plans reviews and fire inspections for the County's Building Department.

14.     During 2010, Plaintiff continued in her role as an Assistant Fire Inspector, and also began assuming some of the duties of the Building Department's Office Manager, who had left the Department.

15.     Such duties included handling administrative responsibilities, such as deposits, billing, and processing disbursement requests. For a period of time Plaintiff also prepared Code Enforcement Board minutes.

3

16.     Effective March 12, 2014, Plaintiff was recognized by James Melvin, the County's Building Official, and head of the Building Department, for receiving certification as a Floodplain Manager, and was awarded a 5% increase in base salary for the same.

17.     Shortly thereafter, Plaintiff began taking coursework to become a Building Plan Examiner.

18.     Because of Plaintiff's disability, James Melvin forbade her from cross-training to become licensed as a Building Inspector, though she continued to press for this permission.

19.     Plaintiff is and was a qualified person with a disability with respect to the building inspector position.

20.     Plaintiff could perform all the essential functions of a building inspector with or without reasonable accommodation.

21.     One manifestation of Plaintiff's disability was a hip problem that Melvin speculated would keep her from climbing during inspections. He tapped her hip with his finger and offered that excuse for not letting her cross train for the building inspector job.

22.     Throughout his tenure as Plaintiff's supervisor, Wakulla County Building Official James Melvin subjected Plaintiff to sexually discriminatory, sexually demeaning, and sexually harassing conduct.

4

23.     Melvin engaged in this behavior despite the fact that his predecessor, Building Official Luther Council, and his Chief Inspector Larry Noles had subjected Plaintiff to a course of sexual harassment so severe from 2006-2008 that the County had conducted an official proceeding on it and fired both Council and Noles.

24.     The County had also been forced to remove a Code Enforcement Board member Bob Danzy in 2015 for a course of sexual harassment of Plaintiff.

25.     Throughout his tenure, Melvin made inappropriate sexual comments to Plaintiff as well as comments related to a woman's subordinate status in the workplace.

26.     Melvin repeatedly hugged Plaintiff and requested that she hug him, though he knew this touching was unwelcome to her.

27.     Melvin was aware of the severity and pervasiveness of the sexual harassment Plaintiff had suffered under his predecessors and the damage that harassment had caused Plaintiff.

28.     Yet Melvin picked up where his predecessors left off.

29.     Melvin compared Plaintiff to a stripper on several occasions. For example, when Plaintiff suffered a disability-related hip fracture, he left a voice mail telling her he had seen a pole-dancer on Facebook who looked like Plaintiff and he wanted her not to break her other hip pole dancing.

5

30.     Melvin told Plaintiff she was "someone's wet dream every night."

31.     Melvin told Plaintiff she had "pervert bait" stamped on her forehead.

32.      Melvin e-mailed Plaintiff crude sexual jokes.

33.      In April or May, 2018, Melvin showed Plaintiff, on his office computer,  what turned out to be a video of naked men skydiving with their penises exposed.

34.     Melvin told Plaintiff that her teeth were pretty on one occasion and on numerous other occasions commented on her body shape and the good fortune of her husband to have a wife with her appearance.

35.      Melvin told Plaintiff that he is "an old man pervert" but can't "cop a feel" on her until he is "at least 80 years old."

36.      The recitation of examples herein of sexual harassment is by no means an effort at exhaustion of instances.

37.      On January 24, 2017, Al Smythe, an Inspector, came into Plaintiff's office and demanded her purchasing card. Plaintiff explained to him that she could not give it to him as it was issued to her and was to be used only by her. He became angry and loud in his demands for the card. Plaintiff asked him multiple times to leave her office. His body stance scared her, as it seemed like he was bracing to hit her. He finally left the office.

38.      This was a traumatic incident that occupied considerable attention

and discussion in the office.

39.     Plaintiff made the point up the chain of command that Smythe would never do such a thing to a male co-worker.

40.     On January 27, 2017, Melvin came into Plaintiff's office and asked her to go to lunch. At lunch, he told Plaintiff that Smythe "has it in" for her. Melvin said Plaintiff needs to "watch [her] back."

41.     Melvin told Plaintiff that Smythe would be watching her carefully and that Smythe was going to do whatever he could to get her in trouble with the Administration.

42.     Plaintiff asked Melvin why he was not doing anything to stop this behavior. Melvin repeated that Smythe was an "alpha male" and that Plaintiff "just needed to stroke his ego to keep the peace," because Smythe does not take "no" from a woman.

43.     In February 2017, Melvin came back to Plaintiff's office and told her that Smythe was still upset because of all that happened and that she needed to be the bigger person and apologize to him. Melvin stated again that Smythe is an "alpha male" and that his ego needs to be stroked. Plaintiff told Melvin that this was unacceptable and he just laughed and told her to watch her back.

44.     On March 10, 2017, Melvin again came to Plaintiff's office to discuss Smythe. Melvin began, "This is me, your Daddy talking to you, so this

7

goes no further than you and me." She told him this was completely inappropriate in the workplace. Melvin revealed that Smythe was driving by Plaintiff's house and watching her. Melvin again said Smythe is an "alpha male" who expects compliant behavior from women.

45.     In March, 2017, retired Chief Building Inspector Charles Ingle visited the office and, upon hearing from Plaintiff what was happening, said he knew things would unfold this way because of Melvin seeking to indulge Smythe.

46.     Smythe was improperly running his own inspection business in competition with the County. This intensified her resistance to his demand to use her County purchase card.  Melvin was enabling Smythe's malfeasance.

47.     On April 11, 2017, Plaintiff scheduled a meeting with the Administration. She met with David Edwards (County Administrator), Brandy King (Budget Coordinator) and Jessica Welch (Public Information Director). Plaintiff told them about the harassment and discrimination in the office. She told them about Melvin's inappropriate comments to her based on her gender. She also told them about what happened with Smythe and the fact that Melvin had said that Smythe was driving by Plaintiff's house and watching her. Edwards started laughing at these concerns, but then he stated that he would hire an outside attorney to investigate what was going on.

48.     Later in the day on April 11, 2017, Melvin came into Plaintiff's

8

office and told her that Smythe was being deposed in a sexual harassment case brought by Debra Russell, a county employee and friend of Plaintiff, against Property Appraiser Brad Harvey. Melvin demanded to know if Plaintiff was involved or being deposed.

49.     On May 17, 2017, Melvin told Plaintiff that she had betrayed him in regard to the Smythe complaint. He told her that she is a woman and needed to be put in her place, that he is her "daddy," and he hopes she learned her lesson. He also said not to cross him again because Plaintiff knows who butters her bread.

50.     On May 31, 2017, Melvin began to strip Plaintiff of many of her duties and responsibilities and assign them to others in the office.

51.     On June 1, 2017, Melvin called Plaintiff into his office and instructed her not to speak, but to shut up and listen. He told her that she did not make a case when she submitted her complaints to Edwards. He stated that she betrayed his trust. He told her she never should have said anything about Smythe to the Administration. He asked who she thought administration would believe if she ever tried to "tattle" on him again. He said they would believe him.

52.     During this time, Plaintiff was cut off from her job training. She reported this to Debbie Dubose (Human Resources). Plaintiff told Dubose that she believed this was retaliation for filing the complaints against Smythe and Melvin.

53.     On June 30, 2017, Plaintiff was subpoenaed and testified in the

9

sexual harassment suit by Debra Russell against Brad Harvey, as mentioned above.

54.     On July 26, 2017, Melvin told Plaintiff to take down all her "fucking certificates" that had been hanging in the front office for more than eight years. Melvin added that he and Administration were aware of Plaintiff's deposition testimony back in June.

55.     The effort to make Plaintiff a non-person intensified.

56.     On August 1, 2017, Plaintiff sent numerous emails to request information she needed for the permitting program. She sent the requests to Property Appraiser Harvey and two of his subordinates, copying Melvin. Melvin wrote back and said that that Harvey was not responding because it is coming from Plaintiff, who is seen as supporting Debra Russell's lawsuit against Harvey. He then told Plaintiff that if Russell continues in her lawsuit, then it will be time to get rid of everyone associated with her (like Plaintiff).

57.     On February 20, 2018, Melvin came to Plaintiff's office, with employee Warren Morhfeld, and began discussing the cross training program that Plaintiff had by then been a part of for 2.5 years. The program is for cross training as a fire safety inspector and was very beneficial for Plaintiff's career. Melvin directed Plaintiff to falsify her On-the-Job-Training documents. Plaintiff refused to falsify the documents to say that she had two hours of training that she had not had. Morhfeld then left the office and Melvin said to Plaintiff that she would never

10

complete her cross training or obtain her building inspector certification because of her disability. He specifically mentioned Plaintiff's problems with her hip joints would keep her from being a building inspector.

58.    By both instruction and example, Melvin sowed disrespect and antagonism for Plaintiff in the two employees she supervised.

59.    On February 20, 2018, one of these subordinates, Kirsten Parrish, instigated a loud confrontation with Plaintiff in the front office in the presence of members of the public. Melvin entered the argument, siding with the insubordinate provocateur and sending Plaintiff home.

60.    The next day, Parrish moved to sabotage Plaintiff's work by ignoring requests to provide materials essential to performance of a task. When Melvin was brought into the dispute, he stripped Plaintiff of that duty and assigned it to Parrish.

61.    Defendant later obtained three falsified affidavits on the February 20, 2018, incident. One was from a person who later admitted not even being present for the incident. The other two were from jackleg builders for whom Melvin allowed building violations and issued improper permits.

62.    In what in retrospect appears to be a set-up, one of the two subordinates asked the other for her remote log-in information loudly enough for Plaintiff to overhear. As their supervisor, Plaintiff was obliged to point out that it would be a violation of County policy for one employee to log in as another.

Plaintiff e-mailed the Administrator's office to confirm the protocol.

63.   Within an hour, Melvin directed Plaintiff to Administration where she met with Edwards. King, and Welch, as well as Melvin. Edwards then told Plaintiff that she was creating a hostile work environment for Kirsten Parrish, who feared for her safety. He placed Plaintiff on paid suspension.

64.   It became obvious that Melvin had orchestrated a quick sequence of confrontations and fabricated disputes involving Plaintiff so he could get her suspended.

65.   Kirsten Parrish was only 18 years old when she came to the office and still less than 20 when these events occurred.

66.   Early in her tenure, she had come to Plaintiff as her supervisor to seek advice and relief for Melvin's unseemly, lecherous behavior toward her. She protested that Melvin was old enough to be her grandfather, but still made her feel creepy with his unrestrained lewd remarks and unwelcome touching.

67.   Over time Parrish became more comfortable with Melvin. After she moved out from her parents' home, Melvin began visiting Parrish at her residence and buying her special gifts of all sorts.

68.   Melvin also had relationships with various builders in the community whose work was often not up to standard. These builders were able to fetch mysterious approvals from Melvin for permits that would not normally be

approved.

69.     It was in this milieu that Melvin arranged for Parrish to start three fights with Plaintiff in rapid succession and to say she now feared for her safety. This fell in conjunction with obtaining false eyewitness affidavits from the three jackleg builders, one of whom was not even on the premises that day.

70.     This was part of Melvin's playing fast and loose with policy and procedure.

71.     The suspension letter that followed was substantially false, including a bogus performance improvement plan.

72.     Plaintiff detailed the errors in the suspension materials.

73.     Defendant refused to correct the falsehoods in the suspension materials.

74.     Plaintiff returned to work on March 5, 2018.

75.     On April 10, 2018, Defendant offered Plaintiff a lower-ranking job as a receptionist at the library. The job lacked advancement opportunity.

76.     Plaintiff had trained for building and fire inspection positions for many years and had been moving up those ranks.

77.     In the wake of Plaintiff's declining the transfer to the library, Defendant stripped Plaintiff of substantially all her duties and froze her out of office interactions.

13

78.    The Clerk of Court relied upon Plaintiff to bring order to the building department's fast and loose adherence to financial policies, especially practices dealing with intake and processing of money and checks. Melvin's general response to Plaintiff's entreaties to follow the policies was, "the fucking Clerk had better stay out of my business."

79.    Melvin shamelessly protected unscrupulous inspectors and jackleg builders and took adverse action against Plaintiff for her efforts to run an honest shop.

80.    But the rot went deeper than Melvin. Even after Melvin retired and Smythe was fired, the retaliation against Plaintiff carried on apace.

81.    Plaintiff's situation became so intolerable that she accepted a different job in June 2018, as a Senior Administrative Assistant. This is a low-skill job with no advancement opportunity. It is a four-day per week job, so Plaintiff loses a day of pay from the transfer.

82.    Plaintiff has been forced to retain counsel to vindicate her rights in this matter and owes a reasonable attorney's fee.

**COUNT I**
**FLORIDA CIVIL RIGHTS ACT**
**TITLE VII**
**GENDER DISCRIMINATION**
**SEXUAL HARASSMENT**

83.    The Plaintiff realleges Paragraphs 1 through 82.

14

84.     Plaintiff is a member of a protected class under applicable law.

85.     By the conduct described above, Defendant engaged in unlawful employment practices and discriminated against and harassed the Plaintiff because of her sex in violation of Title VII of the Civil Rights Act and the Florida Civil Rights Act.

86.     Defendant, acting through Plaintiff's supervisors and peers, created a sexually hostile environment for Plaintiff through gender-based harassment of both a sexual and non-sexual nature.

87.     As a result of Defendant's unlawful discrimination, Plaintiff has suffered damages.

**<u>COUNT II</u>**
**TITLE VII**
**FLORIDA CIVIL RIGHTS ACT**
**RETALIATION**
**(Opposition Clause)**

88.     The Plaintiff realleges paragraphs 1 through 82.

89.     Plaintiff engaged in protected conduct by objecting to the gender-based animus directed to her by Smythe, and to Melvin's sexual harassment of Plaintiff and other women in the Defendant's employ.

90.     Defendant took adverse actions against Plaintiff because of her protected conduct.

91.    The foregoing actions of Defendant constitute retaliation against Plaintiff in violation of Title VII and the Florida Civil Rights Act.

92.    The retaliation described herein was based on Plaintiff's exercise of rights protected by law to resist and oppose gender discrimination and harassment and to participate in actions calculated to redress these grievances.

93.    Plaintiff has suffered damages because of Defendant's actions.

## COUNT III
### TITLE VII
### FLORIDA CIVIL RIGHTS ACT
### RETALIATION
### (Participation Clause)

94.    The Plaintiff realleges paragraphs 1 through 82.

95.    Plaintiff engaged in protected conduct by being a witness for Debra Russell in her sexual harassment suit against Brad Harvey, the County Property Appraiser.

96.    Defendant took adverse actions against Plaintiff because of her protected conduct.

97.    The foregoing actions of Defendant constitute retaliation against Plaintiff in violation of Title VII and the Florida Civil Rights Act.

98.    The retaliation described herein was based on Plaintiff's exercise of rights protected by law to resist and oppose gender discrimination and harassment and to participate in actions calculated to redress these grievances.

16

99.   Plaintiff has suffered damages because of Defendant's actions.

## COUNT IV
## FLORIDA PUBLIC WHISTLEBLOWER ACT

100.   The Plaintiff realleges paragraphs 1 through 82.

101.   Plaintiff engaged in protected conduct by refusing to falsify her time sheets to reflect training hours she did not perform; by seeking to enforce office protocols aimed at preventing fraud and malfeasance; and in objecting to sexual harassment of herself and other women.

102.   Defendant took adverse actions against Plaintiff because of her protected conduct.

103.   Plaintiff has suffered damages because of Defendant's actions.

## COUNT V
## AMERICANS WITH DISABILITIES ACT
## FLORIDA CIVIL RIGHTS ACT

104.   The Plaintiff realleges paragraphs 1 through 82.

105.   Plaintiff is a qualified person with a disability who can perform the essential functions of a building inspector trainee with or without a reasonable accommodation.

106.   Defendant denied Plaintiff participation in a training program for building inspector licensure.

107.   Defendant's denial was because Plaintiff is disabled, and/or because Defendant perceived Plaintiff as disabled, and/or because Plaintiff has a record of a disability.

108.    Plaintiff has suffered damages because of Defendant's actions.

**COUNT VI**
**TITLE VII**
**FLORIDA CIVIL RIGHTS ACT**
**RETALIATION**
**(Participation Clause)**

109.   Two or more agents of Defendant, including without limitation, Heather Encinosa and Ariel Cook, pressed criminal charges against Plaintiff in Wakulla County in late June or July of 2019.

110.   The instant action has been pending since December 19, 2019.

111.   The actions of Wakulla County in seeking criminal prosecution of Plaintiff would not have occurred but for Plaintiff's involvement in discrimination and retaliation litigation against Wakulla County.

112.   Plaintiff recorded workplace conversations in the Wakulla County offices on several occasions in 2018 and 2019.

113.   Plaintiff's recording activities were known to Wakulla County officials, who never told Plaintiff to cease these activities.

114.   Wakulla County's administration building, at all times material hereto, had a sign in the door stating, "THESE PREMISES MAY BE SUBJECT TO AUDIO AND VIDEO RECORDING AT ANY TIME."

115.   Plaintiff produced the recordings to Defendant in discovery.

116.   On June 14, 2019, defense counsel Margaret Zabijaka sent a letter to undersigned counsel asking if Plaintiff intended to use the recordings in the case because she intended to "move to strike them from the case as being obtained in violation of Florida law."  Two sentences later, the letter stated an intention "to file a motion with the Court so that the use of the recordings can be addressed," adding that Defendant intended to seek a discovery extension if the court allowed use of the recordings.

117.   However, Defendant has not filed any motions about the recordings.

118.   Instead, Defendant sought to have Plaintiff arrested.

119.   As a direct result of complaints by Heather Encinosa and Ariel Cook, two law enforcement officers appeared at Plaintiff's home on July 10, 2019, with a search warrant for the recordings and related documents.

120.    The acts of Heather Encinosa and Ariel Cook in this regard are the acts of Wakulla County.

121.    These acts were done in retaliation for Plaintiff's litigation against Defendant.

122.    Plaintiff has suffered damage as a result of Defendant's actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

(a)     that process issue and this Court take jurisdiction over this case;

(b)     judgment against Defendant and for Plaintiff awarding compensatory damages for the Defendant's violations of law enumerated herein;

(c)     judgment against Defendant and for Plaintiff, affording declaratory relief, and permanently enjoining Defendant from future violations of law enumerated herein and reinstatement for the Plaintiff, remedying all benefits of which Plaintiff has been unlawfully deprived;

(d)     prejudgment interest;

(e)     judgment against Defendant and for Plaintiff awarding Plaintiff her attorneys' fees and costs;

(f)     all equitable relief that is allowed by law;

(g)     such other and further relief as is appropriate.

### **Jury Demand**

Plaintiff demands trial by jury on all issues so triable.

*/s/Richard E. Johnson*
Richard E. Johnson, Bar No 858323
LAW OFFICE OF RICHARD E. JOHNSON

20

richard@nettally.com
314 West Jefferson Street
Tallahassee, Florida 32301
Telephone: (850) 425-1997
Facsimile: (850) 561-0836

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I filed this document with the court to be circulated by

the CM/ECF system to all counsel of record this 21st day of July, 2019.


/s/*Richard E. Johnson*
Richard E. Johnson